941 A.2d 475

**Joyce A. GRIFFIN**

v.

**Howard N. BIERMAN, et al.**

**No. 79, Sept. Term, 2007.**

Court of Appeals of Maryland.

Feb. 12, 2008.

Deepak Gupta (Michael T. Kirkpatrick and Brian Wolfman of Public Citizen Litigation Group of Washington, DC, Philip Robinson of Civil Justice Inc. of Baltimore, and Scott Borison of Legg Law Firm, LLC of Frederick), on brief, for appellant.

Jacob Geesing (Bierman, Geesing & Ward, LLC of Bethesda), on brief, for appellees.

Brief of Public Justice Center, Baltimore Cash Campaign, Center for Responsible Lending, Community Law Center, Legal Aid, Bureau, Inc., Maryland Cash Campaign, Maryland Consumer Rights Coalition, Inc., National Association of Consumer Advocates, National Consumer Law Center, and St. Ambrose Housing Aid Center, Inc., as Amici Curiae, for appellant.

Gregory P. Care, Francis D. Murnaghan, Jr., Appellate Advocacy Fellow Public Justice Center, Baltimore, Amici Curiae.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER (Retired, specially assigned), and DALE R. CATHELL (Retired, specially assigned), JJ.

HARRELL, J.

## I. Facts

On 15 May 2001, Joyce Griffin and her fiancé, Herberto Tubaya, purchased a home at 70 Bar Harbor Road (the

"Property") in Pasadena, Maryland. The deed was appropriately recorded among the land records for Anne Arundel County. Griffin testified that she and Tubaya took out a mortgage on the Property in March 2003, which they refinanced on 27 July 2004 with Argent Mortgage.[1] Tubaya died on 25 December 2004. Griffin and her daughter continued to live on the Property.

As a result of Tubaya's death, Griffin wanted to remove his name from the deed. On or about 23 January 2005, she spoke with a representative of Ameriquest, a company at the time affiliated with and owned by the same parent company as Argent Mortgage, who informed her that he would send someone to her house that night to sign the relevant documents. Late that evening, or possibly into the early morning hours of 24 January 2005, Griffin signed the paperwork, solely in her name, taking out a new loan. The new deed of trust extinguished the 2004 mortgage on the Property, paying off a balance of $139,315.29. The new loan was for a principal amount of $153,750.00. The adjustable rate note called for an initial rate of 7.990%, resetting on 1 February 2007. Subject to a few restrictions, the interest rate after that date would be 6.500% above the six-month London Interbank Offered Rate (LIBOR). The new deed of trust was properly recorded among the land records of Anne Arundel County. Initial monthly payments of principal and interest were set at $1,127.10. Paragraph 15 of the new deed of trust provided that "notice to [Griffin] in connection with this Security Instrument shall be deemed to have been given to [Griffin] when mailed by first class mail or when actually delivered to [Griffin]'s notice address if sent by other means." At all relevant times, Griffin resided at and received mail at the Property.

Griffin, without the financial support of her fiancé, quickly fell into default by failing to make payments on the new loan.

---

1. The refinance resulted in an adjustable rate mortgage, with a reset date of August 2006. The initial rate was 10.050% on a loan of $139,500. Thus, the calculated initial monthly payment of principal and interest would have been approximately $1,229.37 per month.

Appellees, Howard Bierman, Jacob Gessing, Carrie M. Ward and Ralph DiPietro ("the Trustees"), were appointed as substitute trustees under the deed of trust on 15 September 2005. The Trustees docketed a foreclosure action in the Circuit Court for Anne Arundel County on 23 September 2005. The Trustees mailed concurrently to Griffin, by certified mail [2] and first-class mail, a letter required by Maryland Code (1974, 2003 Repl.Vol.), Real Property Article, § 7–105 [3] informing her that a foreclosure action "may be or has been" docketed.[4]

---

2. Certified mail, for the purposes of Maryland Code (1974, 2003 Repl. Vol.), Real Property Article, § 7–105 is "certified mail, postage pre-paid return receipt requested. . . ." "Certified Mail service provides the sender with a mailing receipt and, upon request, electronic verification that an article was delivered or that a delivery attempt was made." U.S. POSTAL SERV., DOMESTIC MAIL MANUAL § 503.30, *available at* http://pe.usps. gov/text/DMM300/503.htm# 3_0 (last visited 1 February 2008). "Certified Mail is dispatched and handled in transit as ordinary mail." *Id.* When a postal carrier attempts delivery of certified mail and no one is home, "the letter carrier will leave a notice and return the item to the Post Office. . . . If the sender has not asked for Restricted Delivery, the carrier may deliver the mail to anyone who receives mail at that address." U.S. POSTAL SERV., A CUSTOMER'S GUIDE TO MAILING, *available at* http://pe.usps.com/text/DMM100/sending.htm (last visited 1 February 2008).

When certified mail is returned "unclaimed," this indicates that the "[a]ddressee abandoned or failed to call for mail." U.S. POSTAL SERV., DOMESTIC MAIL MANUAL § 507.1.4, *available at* http://pe.usps.gov/text/ dmm300/507.htm# wp1112908 (last visited 1 February 2008). *See Jones v. Flowers,* 547 U.S. 220, 234, 126 S.Ct. 1708, 1718, 164 L.Ed.2d 415 (2006) ("The return of the certified letter marked 'unclaimed' meant either that Jones still lived at 717 North Bryan Street, but was not home when the postman called and did not retrieve the letter at the post office, or that Jones no longer resided at that address.") By contrast, when a piece of mail is returned "vacant," this indicates that the "[h]ouse, apartment, office, or building [is] not occupied. (Use only if mail addressed 'Occupant.')." U.S. POSTAL SERV., DOMESTIC MAIL MANUAL § 507.1.4, *available at* http://pe.usps.gov/text/dmm300/507. htm# wp1112908 (last visited 1 February 2008). A letter may also be returned as "Moved, Left No Address," which indicates that the "[a]ddressee moved and filed no change-of-address order." *Id.* A certified letter may also be returned as "Refused," meaning that the "[a]ddressee refused to accept mail or pay postage charges on it." *Id.*

3. Unless otherwise noted, all references to the Maryland Code are to Maryland Code (1974, 2003 Repl.Vol.), Real Property Article.

4. The § 7–105 notice is required to inform the recipient:

Mrs. Griffin did not receive either letter. The letter sent by certified mail was returned to the Trustees marked "unclaimed." The letter sent by regular mail was not returned to the Trustees by the Postal Service. On 10 October 2005, Griffin filed a chapter 13 bankruptcy petition in the United States Bankruptcy Court for the District of Maryland. The filing of the bankruptcy petition stayed the foreclosure proceedings in the Circuit Court. Griffin voluntarily dismissed the petition in March 2006.[5]

On 5 April 2006, the Trustees again sent Griffin § 7–105 notices, via certified mail and first-class mail, regarding the revitalized foreclosure proceeding. On 19 April 2006, the Trustees mailed Griffin, again via both first-class and certified mail, the notice required by Maryland Rule 14–206(b)(2)[6]

---

Mortgage foreclosure is a complex process. Some people may approach you about "saving" your home. You should be careful about any such promises.

The State encourages you to become informed about your options in foreclosure before entering into any agreements with anyone in connection with the foreclosure of your home. There are government agencies and nonprofit organizations that you may contact for helpful information about the foreclosure process. For the name and telephone number of an organization near you, please call the Consumer Protection Division of the Office of the Attorney General of Maryland at 1–888–743–0023. The State does not guarantee the advice of these organizations.

Do not delay dealing with the foreclosure because your options may become more limited as time passes.

Maryland Code (1974, 2003 Repl.Vol.), Real Property Article, § 7–105.

**5.** It is suggested that Griffin entered into a consent order modifying the bankruptcy stay in which order she agreed to make mortgage payments. The record of the bankruptcy case, however, is not part of the record here. Griffin did not cure the pre-bankruptcy default.

**6.** Maryland Rule 14–206(b)(2) states:

(A) Before making a sale of the property, the person authorized to make the sale shall send notice of the time, place, and terms of sale by certified mail and by first class mail to the last known address of (i) the 'debtor, (ii) the record owner of the property, and (iii) the holder of any subordinate interest in the property subject to the lien. (B) The notice of the sale shall be sent not more than 30 days and not less than ten days before the date of the sale to all such persons whose identity and address are actually known to the person authorized to make the sale or are reasonably ascertainable from a docu-

informing Griffin of the time, date (2 May 2006), and location of the public foreclosure sale.[7] This notice also was mailed to the Property address, addressed to "Occupant," via certified and first-class mail. The certified letter addressed to Occupant was returned to the Trustees "unclaimed." The trial court found that Griffin did not receive any of these notices. None of the regular mailings were returned to the Trustees. On 1 May 2006, the certified letter dated 5 April 2006 was received by the Trustees from the Postal Service marked "unclaimed."

The Property was sold at auction on 2 May 2006 to Elizabeth A. Strasnick for $223,000. Ms. Griffin did not attend the sale. The trial court found that she first was informed of the foreclosure sale, after it occurred, when Strasnick posted notice on the door of the house on the Property informing Griffin that Strasnick had purchased the Property. On 17 May 2006, 15 days after the foreclosure sale, the 19 April 2006 certified mail letter was returned to the Trustees marked "unclaimed."

It was conceded that the Trustees took no additional actions to notify Griffin of the pendency of the sale after receiving the returned "unclaimed" certified letters. It also is without dispute that the Trustees complied with Maryland statutory law and this Court's rules regarding notice requirements in the foreclosure process.

Griffin contacted an attorney and filed exceptions to the foreclosure sale. After hearing testimony and argument, the Circuit Court issued an Order and Memorandum Opinion on 1 November 2006 refusing to set aside the foreclosure sale. The sale was then ratified. Griffin filed a timely appeal to the Court of Special Appeals, arguing that the foreclosure process violated her right to due process of law for lack of notice.

---

ment recorded, indexed, and available for public inspection 30 days before the date of the sale.

7. The Trustees also published the time, date, and location of the sale in the Anne Arundel County Edition of the *Baltimore Sun,* in compliance with Maryland Rule 14–206(b)(1).

Before the intermediate appellate court could decide the appeal, we issued a Writ of Certiorari, on our initiative, to consider whether the Circuit Court was correct in denying Griffin's exceptions to the foreclosure sale.

## II. Standard of Review

Maryland Rule 8–131(c) states:

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

■ This rule has "been consistently interpreted to require that appellate courts accept and be bound by findings of fact of the lower court unless they are clearly erroneous." *Ryan v. Thurston*, 276 Md. 390, 392, 347 A.2d 834, 835 (1975); *see also Schade v. Md. State Bd. of Elections*, 401 Md. 1, 33, 930 A.2d 304, 322 (2007). "The deference shown to the trial court's factual findings under the clearly erroneous standard does not, of course, apply to legal conclusions." *Nesbit v. Gov't Employees Ins. Co.*, 382 Md. 65, 72, 854 A.2d 879, 883 (2004). We, instead, review de novo the trial court's legal conclusions. *Goff v. State*, 387 Md. 327, 337–38, 875 A.2d 132, 138 (2005).

## III. Analysis

■ The veneer of Griffin's challenge to the foreclosure sale is that her right to due process of law, guaranteed by the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights,[8] was violat-

---

8. The parties agree that a mortgage foreclosure constitutes state action, and thus, the foreclosure process must satisfy constitutional due process requirements. *See Knapp v. Smethurst*, 139 Md.App. 676, 706, 779 A.2d 970, 987 (2001) ("Appellees concede that a mortgage foreclosure conducted pursuant to a legislatively enacted statute and rules promulgated by the Court of Appeals constitutes state action." (internal quotations omitted)); *McCann v. McGinnis*, 257 Md. 499, 505, 263 A.2d 536 (1970)

ed, in application, by the failure to receive advance notice of the sale. Although Griffin firmly maintains that her constitutional objections are in the form of an "as-applied" challenge, but necessarily, her arguments embrace, as well, a facial challenge to the Maryland foreclosure notice scheme.[9] A

---

("The court is the vendor in the case of a sale under the power contained in a mortgage. . . .").

**9.** Griffin's facial challenge to the foreclosure scheme is not limited to an "as-applied" challenge simply because she did not receive actual notice. *See Nelson v. Diversified Collection Servs., Inc.,* 961 F.Supp. 863, 869 (D.Md.1997) ("But due process does not require that the interested party actually receive the notice Receipt of the notice is not material to this inquiry." (citations omitted)); *Golden Sands Club Condominium, Inc. v. Waller,* 313 Md. 484, 502, 545 A.2d 1332, 1341 (1988) (noting that "provision for (not receipt of) actual notice" is the proper constitutional standard for notice schemes).

Griffin's brief implies that her challenge is, in fact, a facial challenge to the Maryland foreclosure notice scheme. In discussing the reliability of regular mail, Griffin proposes a number of hypothetical scenarios, including situations with a bad address (". . . the intended recipient has moved away permanently, or is on an extended absence, or is in the hospital"), physical delivery impediments (". . . weather conditions or physical obstructions are getting in the way"), and third-party intervention (". . . someone else is stealing from the mailbox"). Nothing in the record indicates any of these problems affected the delivery of Griffin's mail. In fact, she testified that she did not have any problems with receiving mail prior to her complaints regarding the unreceived foreclosure notices. Had there been any indication that any of Griffin's hypotheticals hindered delivery of the mailed notices to her, the present case might be considered solely as an "as-applied" challenge to the statute. It is precisely because the facts of the instant case, with the exception of the notices not being received ultimately by Griffin, present a normal scenario that the case embraces a facial challenge to the Maryland notice scheme as well. "A statute can violate procedural due process rights as applied if the notice and opportunity to be heard either were not provided to the plaintiff or their provision was inadequate." *Nelson v. Diversified Collection Servs., Inc.,* 961 F.Supp. 863, 868 (D.Md.1997). In the instant case, there is no dispute that the notice provisions as to Griffin were provided, i.e., the Trustees properly mailed notice in accordance with the relevant statute and rule. Griffin's challenge, therefore, rests on the assertion that the provisions for notice in the statute and rule were inadequate. Although we disagree with their ultimate conclusion, the amici correctly note that "this home mortgage foreclosure case exhibits . . . the mortgage foreclosure procedures employed currently in Maryland." Brief of Public Justice Center et al. as Amici Curiae For Appellant at xiii. As such, Griffin's argument encompasses a facial challenge to the notice scheme.

finding in Griffin's favor would compel an obligation requiring that a foreclosing mortgagee provide proof of actual notice to the mortgagor. Because such a ruling would have such a profound effect on the notice foreclosure scheme, Griffin's challenge first must be treated as a facial challenge.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The method of giving notice to affected parties must be such "as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected...." *Mullane*, 339 U.S. at 315, 70 S.Ct. at 657.

The "constitutionality of a particular procedure for notice is assessed *ex ante*, rather than *post hoc.*" *Jones v. Flowers*, 547 U.S. 220, 231, 126 S.Ct. 1708, 1717, 164 L.Ed.2d 415 (2006). "The proper inquiry is whether the state acted reasonably in selecting means likely to inform persons affected, not whether each property owner actually received notice." *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir.1988). There is no cookie cutter paradigm for determining the constitutionality of a particular procedure designed to convey notice. "[D]ue process is flexible and calls only for such procedural protections as the particular situation demands. Procedures adequate under one set of facts may not be sufficient in a different situation." *Dep't of Transp. v. Armacost*, 299 Md. 392, 416, 474 A.2d 191, 203 (1984). "To determine whether notice in ₁a particular case is constitutionally sufficient, the court 'must balance the interests of the state or the giver of notice against the individual interest sought to be protected by the fourteenth amendment.'" *Miserandino v. Resort Props., Inc.*, 345 Md. 43, 53, 691 A.2d 208, 212 (1997) (quoting *Golden*

*Sands Club Condo. v. Waller,* 313 Md. 484, 496, 545 A.2d 1332, 1338 (1988)); *see also Jones,* 547 U.S. at 229, 126 S.Ct. at 1715 (stating that "assessing the adequacy of a particular form of notice requires balancing the 'interest of the State against the individual interest sought to be protected by the Fourteenth Amendment' " (quoting *Mullane,* 339 U.S. at 314, 70 S.Ct. at 657)); *Golden Sands,* 313 Md. at 501, 545 A.2d at 1341 ("It is . . . true that the more significant the interest at stake, the greater the required certainty that the notice will be effective.").

■■■■ "We are dealing here with the notice requirements of procedural due process. In that context, actual receipt of notice is not the test." *Golden Sands,* 313 Md. at 500, 545 A.2d at 1340. Due process "does not require a showing by the State that an interested party received actual notice, and '[n]otice by mail is ordinarily presumed to be constitutionally sufficient.' " *Crum v. Vincent,* 493 F.3d 988, 993 (2007) (quoting *Nunley v. Dep't of Justice,* 425 F.3d 1132, 1136 (8th Cir.2005)); *see also Jones,* 547 U.S. at 226, 126 S.Ct. at 1713 ("Due process does not require that a property owner receive actual notice before the government may take his property."). "In general, 'reasonably calculated notice' under Mullane is met where the government sends a notice to the address provided by a party pursuant to a legal requirement to provide the government with an address." *In re Duran,* 347 B.R. 760, 767 (Bankr.D.Colo.2006). Due process "does not require with regard to notice that 'the state . . . erect an ideal system for the administration of justice which is impervious to malfunctions.' " *Carroll v. D.C. Dep't of Employment Serv.,* 487 A.2d 622, 623 (D.C.1985) (quoting *Osborn v. Review Bd. of Ind. Employment Sec. Div.,* 178 Ind.App. 22, 381 N.E.2d 495, 500 (1978)).

The Supreme Court has elaborated, on two recent occasions, on the *Mullane* standard. First, in *Dusenbery v. United States,* 534 U.S. 161, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002), the Supreme Court held that the sending of a certified letter, though not received by the interested party, satisfied due

process. In *Dusenbery,* the government initiated a forfeiture proceeding against an inmate to recover cash seized during the course of an The government sent certified letters to the prison, to the inmate's mother's house, and the inmate's former address. *Dusenbery,* 534 U.S. at 164, 122 S.Ct. at 698. The inmate claimed that he never received notice of the forfeiture proceeding. *Id.* The Supreme Court noted that actual notice is not required to satisfy constitutional due process. *Dusenbery,* 534 U.S. at 170, 122 S.Ct. at 701. Instead, due process "requires only that the Government's effort be reasonably calculated to apprize a party of the pendency of the action." *Id.* (internal quotations omitted). The Supreme Court concluded that the inmate's right to due process was not violated. *Dusenbery,* 534 U.S. at 172, 122 S.Ct. at 702.

In *Jones v. Flowers,* 547 U.S. 220, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006), the State of Arkansas sent certified letters to a property owner indicating that his property taxes were in arrears and the property would be sold at a tax sale. The letters were returned "unclaimed." *Jones,* 547 U.S. at 224, 126 S.Ct. at 1712. The State then published notice of the tax sale in a local newspaper. *Id.* The property eventually was sold at a tax sale, unbeknownst to the delinquent property owner. *Jones,* 547 U.S. at 224, 126 S.Ct. at 1713. The Supreme Court held that where the State knew that the certified notice letters, the only type of notice required to be sent under the relevant statute, was not delivered, the State must take further reasonable steps to attempt to notify the interested party. *Jones,* 547 U.S. at 230, 126 S.Ct. at 1716. Although the Supreme Court refused to "to prescribe the form of service that the [government] should adopt," the Court listed several additional steps that Arkansas could have taken. *Jones,* 547 U.S. at 234, 126 S.Ct. at 1718. "One reasonable step ... required." *Jones,* 547 U.S. at 234, 126 S.Ct. at 1719. "Other reasonable follow-up measures would have been to post notice on the front door or address otherwise undeliverable mail to 'occupant.'" *Jones,* 547 U.S. at 235, 126 S.Ct. at 1719.

We conclude that the Maryland foreclosure notice process passes constitutional muster. The Maryland foreclosure scheme, as applied in the present case, represents a hybrid of the situations discussed in *Jones* and *Dusenbery*. Like *Dusenbery*, the Trustees in the present case did not have certain knowledge that Griffin had not received notice. The letters sent via first-class mail and certified mail were identical. In fact, each letter would reveal to a reader that another, identical letter had been sent via the other form of postal delivery. A recipient of the first-class mail notice, therefore, likely would not go to the post office to sign for a duplicate letter which, in substance, he or she had received already. This is confirmed by the Trustees' repeated assertions, both in the Circuit Court and at oral argument before this Court, that a high percentage of certified mail notices in a dual mailing requirement scheme, such as exists in Maryland's mortgage foreclosure scheme, are returned "unclaimed." *See Crum v. Mo. Dir. of Revenue*, 455 F.Supp.2d 978, 989 (W.D.Mo.2006) *aff'd sub nom. Crum v. Vincent*, 493 F.3d 988 (8th Cir.2007) ("[T]he Board had recently sent notices to the address provided by Richards [via first-class mail] and the notices were not returned. Thus, when the certified letters were returned, it was reasonable for the Board ... to correctly conclude that Richards's refusal to claim the latest notices was the result of choice...."). In *Jones*, by contrast, the State of Arkansas knew for certain that the property required to employ, certified mail, was returned unclaimed.[10] *Jones*, 547 U.S. at 224, 126 S.Ct. at 1712.

---

**10.** Arkansas also published notice of the tax sale in a local newspaper. Therefore, Griffin argues, Arkansas was never certain absolutely that the property owner had not received actual notice. Nonetheless, "notice by publication is adequate only where 'it is not reasonably possible or practicable to give more adequate warning.'" *Jones*, 547 U.S. at 237, 126 S.Ct. at 1720 (quoting *Mullane*, 339 U.S. at 317, 70 S.Ct. at 658). The Supreme Court has called notice by publication "an indirect and even a probably futile means of notification." *Mullane*, 339 U.S. at 317, 70 S.Ct. at 658. The Supreme Court, when evaluating the effectiveness of publication, noted that "[i]n weighing its sufficiency on the basis of equivalence with actual notice we are unable to regard this as more than a feint." *Mullane*, 339 U.S. at 315, 70 S.Ct. at 658; *see also*

The Trustees in the instant case, following Maryland's notice requirements, satisfied the alternative steps considered by the Supreme Court in *Jones*. The Supreme Court suggested that Arkansas could provide for sending notice via first-class mail. *Jones*, 547 U.S. at 234, 126 S.Ct. at 1719. The Trustees pertinently did that twice following the lifting of the bankruptcy stay. The Supreme Court also suggested that Arkansas could send notices to "Occupant" via first-class mail. *Jones*, 547 U.S. at 235, 126 S.Ct. at 1719. The Trustees sent notice to "Occupant" via first-class and certified mail. It is of no consequence that the Trustees sent notices via first-class mail at the same time as they sent the certified mail notices. The Maryland scheme assumes a worst case scenario, that the certified mail would be undeliverable, therefore first-class mail notice is necessary in conjunction with the certified mail, even if the certified mail is delivered successfully. Section 7–105 of the Maryland Code and Maryland Rule 14–206 are not constitutionally infirm merely because they do not require the certified mail to be returned as undeliverable prior to requiring the Trustees to send notice via first class mail. The only

---

*City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 296, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953) ("Notice by publication is a poor and sometimes a hopeless substitute for actual service of notice. Its justification is difficult at best."). Although one who utilizes publication as its only method of giving notice cannot be absolutely certain that an interested property owner did not comb through the small print of the back pages of the correct newspaper and stumble upon the notice, the chance of such an event occurring is deemed too minuscule be considered a distinguishing feature of *Jones*. *See Taylor v. Westly*, 488 F.3d 1197, 1201 (9th Cir.2007) ("Indeed, *Jones* reemphasized the holding in *Mullane* that mere publication is not constitutionally adequate-except in special circumstances-because chance alone brings a person's attention to an advertisement in small type inserted in the back pages of a newspaper." (internal quotations omitted)).

The Supreme Court seems to have ignored that remote possibility entirely. The Supreme Court framed in *Jones* those steps necessary to satisfy due process "when the government becomes aware prior to the taking that its attempt at notice has failed The question presented is whether such knowledge on the government's part is a 'circumstance and condition' that varies the 'notice required.'" *Jones*, 547 U.S. at 227, 126 S.Ct. at 1714. Despite the publication in the newspaper, Arkansas was deemed to be "aware" and have "such knowledge" that its efforts at conveying notice had failed. *Id.*

substantive difference between the Maryland scheme and the satisfactory schemes inventoried by the Supreme Court in *Jones* is that Maryland requires first-class mail to be sent in all cases, whereas the Supreme Court suggested that it was necessary only in cases where the certified mail is returned to the sender undelivered.[11] *Jones,* 547 U.S. at 234, 126 S.Ct. at 1719.

Griffin attempts to carve the Maryland notice scheme into its individual pieces, arguing that each individual element, on its own, is constitutionally deficient. Therefore, Griffin contends, she was deprived of due process. She correctly notes that *Jones* holds that, on its own, certified mail that is returned "unclaimed" does not satisfy due process. Seizing on our holding in *Miserandino,* Griffin maintains that notice sent via first class mail, standing alone, does not satisfy due process. Finally, conveying notice solely by publication, when the addresses of the interested parties are reasonably available to the sender, does not satisfy due process. *Mullane,* 339 U.S. at 318, 70 S.Ct. at 659; *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 799–800, 103 S.Ct. 2706, 2711, 77 L.Ed.2d 180 (1983). Because each individual component would not satisfy due process on its own, Griffin argues, the foreclosure scheme as a whole is constitutionally infirm.

Griffin's argument fails for two reasons. First, our holding in *Miserandino* is easily distinguishable from the instant case. In *Miserandino,* a Virginia company obtained a judgment in Virginia courts against Maryland residents. *Miserandino,*

---

**11.** Our holding would be different, however, had the first-class mail notices been returned undelivered, *Nichol v. Howard,* 112 Md.App. 163, 684 A.2d 861 (1996), or the certified mail had been returned as something more revealing than "unclaimed," *Kennedy v. Cummings,* 91 Md.App. 21, 603 A.2d 1251 (1992). Had the Trustees known that their attempts to convey notice to Griffin failed, in accordance with *Jones,* reasonable follow-up measures to attempt to give notice to the interested property owner might be required. *See Tupaz v. Clinton County, N.Y.,* 499 F.Supp.2d 182, 187 (N.D.N.Y.2007) (*"Jones* requires that a state or municipality make reasonable efforts to notify a landowner when it receives 'new information' that the landowner had not received the sale notice sent to the address on file with the state or municipality.")

345 Md. at 47, 691 A.2d at 209. The company gave notice of the proceeding to the Maryland residents by sending service of process via first-class mail, as permitted by the Virginia rules. *Miserandino*, 345 Md. at 56–57, 691 A.2d at 214. When the Virginia company attempted to execute the judgment in Maryland, we held that the original service of process via first-class mail was insufficient to convey notice in an action for a money judgment. *Miserandino*, 345 Md. at 68, 691 A.2d at 220. We repeatedly noted that the nature of the action was a significant factor in our holding. "Among the multiple factors to be considered in brought." *Miserandino*, 345 Md. at 53, 691 A.2d at 213. "Although the distinction between in rem and in personam actions no longer offers a per se solution to problems of notice, the nature of the action continues to be relevant." *Miserandino*, 345 Md. at 54, 691 A.2d at 213.

> The case before us is not in rem or quasi in rem. This case involves an attempt by one party to obtain a money judgment against another party or parties for an alleged breach of a promise to pay. It is a classic example of a case requiring the acquisition of in personam jurisdiction. Historically, in-hand delivery of process has been the preferred method of service in a case of this kind....

*Miserandino*, 345 Md. at 55–56, 691 A.2d at 214.

*Miserandino* is distinguishable from the instant case. In contrast to *Miserandino*, the instant foreclosure action is an *in rem* proceeding, although that description alone would not be dispositive of a constitutional challenge. *G.E. Capital Mortgage. Servs., Inc. v. Levenson*, 338 Md. 227, 245, 657 A.2d 1170, 1178 (1995); *Wells Fargo Home Mortgage., Inc. v. Neal*, 398 Md. 705, 726, 922 A.2d 538, 550 (2007). In the instant case, Griffin authorized service by mail in Paragraph 15 of the deed of trust and knew that she had fallen behind in mortgage payments. This is not comparable to the original, long-arm service of process at issue in Miserandino.[12] "The Supreme

---

12. The type of action involved in a case serves as a distinguishing feature in our prior case law. We approved the use of first-class mail in other types of actions. In a wage garnishment action, we noted:

Court has frequently said ... that, under most circumstances, notice sent by ordinary mail is deemed reasonably calculated to inform interested parties that their property rights are in jeopardy." *Weigner v. City of New York*, 852 F.2d 646, 650 (2nd Cir.1988) (citing *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 490, 108 S.Ct. 1340, 1343, 99 L.Ed.2d 565 (1988); *Mennonite Bd.*, 462 U.S. at 800, 103 S.Ct. at 2712; and *Mullane*, 339 U.S. at 319, 70 S.Ct. at 659).

A distinction is properly made also because *Miserandino* was decided on Federal constitutional grounds. Because we decide that the notice process in the instant case satisfies federal constitutional requirements based on recently decided Supreme Court precedent, reliance on *Miserandino* to attack the notice in the instant case is misplaced.

Second, the whole of the Maryland notice scheme is greater than the sum of its parts. *See Turner v. Blackburn*, 389 F.Supp. 1250, 1258 (W.D.N.C.1975) ("Defendants have urged, in effect, that we examine the various elements of the foreclosure proceeding as disparate bits and pieces. But ... we view the statutory framework as a coherent entity."). That this precept is more compelling in an analysis of the constitutional challenge at hand than Griffin's urging is supported by the Supreme Court's consideration in *Jones* of several reasonable measures, although perhaps insufficient each on its own, that would be part of an entire scheme that satisfies due process. For example, the Supreme Court recommended that Arkansas post notice on the property in question or send mail addressed to "Occupant." *Jones*, 547 U.S. at 235, 126 S.Ct. at 1719. Posting, however, is more vulnerable to constitutional attack

---

Although the governmental action in this case clearly threatened a constitutionally protected property interest of Mr. Ruby, we conclude that service of the notice by ordinary mail was sufficient. We note that there was nothing to suggest that Mr. Ruby was a transient individual, or that the address given by Mrs. Ruby was not correct. The court mailed the notice of default to that address in January, 1985, and it was not returned. Similarly, the court mailed a copy of the final judgment on April 18, and it was not returned.

*Goodyear Tire & Rubber Co. v. Ruby*, 312 Md. 413, 420–21, 540 A.2d 482, 485 (1988).

than either certified or first-class mail. It is well settled that posting, on its own, may not satisfy due process. *See Greene v. Lindsey,* 456 U.S. 444, 455–56, 102 S.Ct. 1874, 1880, 72 L.Ed.2d 249 (1982) (holding that posting notice and publication of notice in newspaper were unreliable, and therefore, constitutionally inadequate, but noting that "[n]otice by mail in the circumstances of this case would surely go a long way toward providing the constitutionally required [due process]"); *Schroeder v. City of New York,* 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962) (same).

Similarly, it seems doubtful that the Supreme Court would endorse solely sending a letter addressed to "Occupant" as sufficient notice. These seemingly inadequate methods of delivering notice when considered individually, however, were endorsed by the Supreme Court in *Jones* because, together with other methods of conveying notice, they may combine to produce a constitutionally sufficient notice system. *Jones,* 547 U.S. at 235, 126 S.Ct. at 1719.

 Despite Griffin's dogged efforts at oral argument to evade a response to this Court's questions aimed at determining what she thought would be notice actions, the inescapable conclusion of her argument, taken to its logical end, is that due process requires personal service in mortgage foreclosure actions.[13] Griffin requests that we declare the foreclosure notice scheme unconstitutional without consideration of other reasonable steps that could have been taken in this case. Such a holding would constitute narrowly parsed and confusing jurisprudence. To paraphrase the Supreme Court in *Jones,* "if there were no reasonable additional steps the [Trustees] could have taken upon return of the unclaimed notice letter, it cannot be faulted for doing nothing." *Jones,* 547 U.S. at 234, 126 S.Ct. at 1718. The only remaining reasonable

---

13. The amici, however, had they been arguing the case, apparently would have acknowledged that personal service is the only method of notice delivery which would address Griffin's concerns, stating that "this Court should now hold that Maryland due process requires personal service in mortgage foreclosure actions." Brief of Public Justice Center et al. as Amici Curiae For Appellant at 33.

method of conveying notice that would conceivably have made a difference in the present case is posting notice on the Property. As discussed above, however, posting is an unreliable and constitutionally insufficient form of notice. Moreover, the posting of property gives no feedback to the sender regarding whether notice actually was received. In this respect, it is less reliable and useful than either first-class [14] or certified mail.

The final remaining method of conveying notice is personal service. Personal service is the only method of conveying notice that is certain to convey actual notice. Personal service is, therefore, the only method that would seem to satisfy Griffin's complaints about notice.

■■■ There may be merit, as a policy matter, to requiring that mortgagees personally serve property owners with notice of foreclosure. It is not, however, required to satisfy the constitutional requirements of due process. The Supreme Court expressly spurned the notion that the State must look in the phonebook or income tax rolls to attempt to convey notice to an interested property owner. *Jones*, 547 U.S. at 235–36 at 126 S.Ct. at 1719. Due process cannot be said to require personal service when it does not require flipping through the local phonebook. Griffin cites no authority, and our research reveals none, for the proposition that due process mandates personal service of process in mortgage foreclosures.

Our conclusion is buttressed by an older Supreme Court case, *Nelson v. City of New York*, 352 U.S. 103, 77 S.Ct. 195, 1 L.Ed.2d 171 (1956), decided six years after the Supreme

---

**14.** If first-class mail is undeliverable, it is returned to the sender. At which point, the sender knows that notice was not received. By contrast, the posting of the property gives the sender no feedback regarding the receipt of notice. Requiring the posting of the property in addition to the current mailing requirements would not give the sender any more certainty that notice was, or was not, received by the intended recipient. Thus, if we were to adopt Griffin's reasoning that *Jones* imposes a duty on the Trustees in a dual mailing scheme to take additional action after the certified mail notice is returned "unclaimed," that duty would be no more satisfied by posting than by sending first-class mail.

Court's landmark decision in *Mullane*. In *Nelson v. City of New York*, the City of New York mailed a copy of the newspaper-published notice of the foreclosure proceeding to the property owner's correct address. *Nelson v. City of New York*, 352 U.S. at 105, 77 S.Ct. at 197. The property owner argued that he did not receive actual notice of the foreclosure sale, suggesting that the notice may have been concealed from him by his bookkeeper. *Nelson v. City of New York*, 352 U.S. at 107, 77 S.Ct. at 197. The Supreme Court held that due process was satisfied when the notice was mailed to the correct address, despite the fact that the property owner did not receive actual notice.[15] *Nelson v. City of New York*, 352 U.S. at 109–10, 77 S.Ct. at 198. The Court concluded, "We hold that nothing in the Federal Constitution prevents [foreclosing and retaining the proceeds of sale] where the record shows adequate steps were taken to notify the owners of the charges due and the foreclosure proceedings." *Nelson v. City of New York*, 352 U.S. at 110, 77 S.Ct. at 199. *Nelson v. City of New York* remains good law, and recently was cited with approval in harmony with *Jones*. *Tupaz v. Clinton County, N.Y.*, 499 F.Supp.2d 182, 187–92 (N.D.N.Y.2007). *Nelson v. City of New York* and later cases have been read to authorize notice via first-class mail in foreclosure proceedings.[16] *See Hollander v. City of New York*, 130 Misc.2d 1039, 498 N.Y.S.2d 953, 955 (N.Y.Sup.Ct.1985)

(Further examination of the *Mennonite Mission Board*[*Mennonite Bd. of Missions*] case reveals that the court repeatedly cited the *Mullane* case with approval, and after its reference, with approval of the *Nelson v. City of*

---

**15.** Because of the procedural default, the property owner in *Nelson v. City of New York* was also deprived of the proceeds of the sale in excess of the amount owed. *Nelson v. City of New York*, 352 U.S. at 106, 77 S.Ct. at 197.

**16.** *See Turner v. Blackburn*, 389 F.Supp. 1250, 1259 n. 43 (W.D.N.C. 1975) (striking down North Carolina's publication-only foreclosure notice scheme, but noting that "[m]ailing or hand-delivering to mortgagors who reside at or conduct their business on the encumbered property would appear to suffice").

*New York* case, immediately following; in fact, in the very next paragraph stated 'Personal service or mailed notice is required....' .... Thus, in the context of the court's citation of *Nelson v. City of New York*, the omission of the words 'certified mail' can only mean that the court intended to also approve 'ordinary mail.').

Assuming, *arguendo*, that we were to accept Griffin's challenge to the notice scheme solely as an "as-applied" challenge, our conclusion would be the same. An "as-applied" challenge is a claim that a valid law is "unconstitutional on the facts of a particular case or in its application to a particular party." BLACK'S LAW DICTIONARY 244 (8th ed.1999). As noted above, the only fact distinguishing the instant case from the typical foreclosure case is that the trial judge found as a matter of fact that Griffin did not receive actual notice of the pending foreclosure sale. The fact that Griffin did not receive actual notice does not render the law unconstitutional as applied to her. It is well settled that due process of law is not violated in application because the interested party did not receive actual notice. *See Nelson v. Diversified Collection Servs. Inc.*, 961 F.Supp. 863, 868 (D.Md.1997) ("Ms. Nelson's as applied procedural due process arguments rest on the idea that she did not receive notice. The key to the analysis, however, is whether the notice was mailed, not whether it was received...."); *Jones*, 547 U.S. at 226, 126 S.Ct. at 1713 ("Due process does not require that a property owner receive actual notice before the government may take his property."); *Golden Sands*, 313 Md. at 502, 545 A.2d at 1341 (stating that "provision for (not receipt of) actual notice" is the proper constitutional standard for notice schemes); *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir.1988) ("The proper inquiry is whether the state acted reasonably in selecting means likely to inform persons affected, not whether each property owner actually received notice."); *Dusenbery*, 534 U.S. at 170, 122 S.Ct. at 701 ("[*Mennonite* ] does not say that the State *must provide* actual notice, but that it *must attempt* to a mortgagee of record was constitutionally sufficient." (citations omitted)); *Sec. Exch. Comm'n v. Jett*, 514 F.Supp.2d

532, 536 (S.D.N.Y.2007) ("Actual notice is not required. Moreover, service by mail ordinarily is adequate to provide reasonable notice."); *Lewis v. City of St. Louis,* 607 F.Supp. 614, 617 (E.D.Mo.1985), *aff'd,* 786 F.2d 1169 (8th Cir.1986) ("In proceedings involving life, liberty or property actual notice or something designed to ensure actual notice is required. Personal service constitutes actual notice and notice by mail is designed to ensure actual notice and thereby satisfies minimal requirements of due process.").

 Griffin urges us to interpret Article 24 of the Maryland Declaration of Rights to require greater protection to ensure notice than that required by the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. Although "[o]ur precedent states clearly that the Maryland and Federal due process provisions have been read *in pari materia,"* *Koshko v. Haining,* 398 Md. 404, 444 n. 22, 921 A.2d 171, 194 n. 22 (2007), the two are not synonymous. *Aero Motors, Inc. v. Motor Vehicle Admin.,* 274 Md. 567, 587, 337 A.2d 685, 699 (1975).

> We have often commented that such state constitutional provisions are *in pari materia* with their federal counterparts or are the equivalent of federal constitutional provisions or generally should be interpreted in the same manner as federal provisions. Nevertheless, we have also emphasized that, simply because a Maryland constitutional provision is *in pari materia* with a federal one or has a federal counterpart, does not mean that the provision will always be interpreted or applied in the same manner as its federal counterpart. Furthermore, cases interpreting and applying a federal constitutional provision are only persuasive authority with respect to the similar Maryland provision.

*Dua v. Comcast Cable of Md., Inc.,* 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002); but *see Home Utils. Co. v. Revere Copper & Brass, Inc.,* 209 Md. 610, 614, 122 A.2d 109, 111 (1956) ("[T]he decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities [regarding Article 24]."); *Oursler v. Tawes,* 178 Md. 471, 483, 13 A.2d 763, 768 (1940) ("[Article 24] of the Maryland Declaration of Rights is

in harmony with the 5th and 14th amendments to the Federal Constitution, and the term 'due process of law' as used in said amendments has been construed to be synonymous with the expression 'Law of the Land.' ").

We have analyzed before foreclosure situations and the required notice scheme in the context of the State constitution. In *Sanchez v. James,* 209 Md. 266, 120 A.2d 836 (1956), we upheld a tax sale that occurred without actual notice to the property owners. The Court noted that "the Legislature may validly provide that persons having an interest in real properly sold at a tax sale shall be given notice by publication, and that personal service of process in such proceedings is unnecessary." *Sanchez,* 209 Md. at 270, 120 A.2d at 837. This aspect of *Sanchez,* of course, is clearly no longer good law and probably was incorrect at the time it was decided. Nonetheless, it illustrates that the Maryland Constitution affords no greater due process protection than the Federal Constitution in the foreclosure context. *See St. George Antiochian Orthodox Christian Church v. Aggarwal,* 326 Md. 90, 98 n. 7, 603 A.2d 484, 488 n. 7 (1992) ("Some of our earlier cases, describing tax foreclosure cases as in Mullane, the Supreme Court rejected the notion that due process rights may vary depending on whether actions are in rem or in personam." (citing *Hauver v. Dorsey,* 228 Md. 499, 503–04, 180 A.2d 475, 478 (1962) and *Sanchez,* 209 Md. at 270, 120 A.2d at 837)).

We again note the lack of authority for the proposition that constitutional due process requires personal service of process in mortgage foreclosures. In *Haas v. Lockheed Martin Corp.,* 396 Md. 469, 483 n. 10, 914 A.2d 735, 743 n. 10 (2007), we distilled the relationship between Maryland constitutional provisions and those of other sovereigns into the "homespun idiom" that "[j]ust because [Georgia] ran off a cliff doesn't mean [Maryland] has to follow suit." In the instant case, however, Maryland's courts would be alone in making the largely policy-driven leap were we to embrace Griffin's entreaty. Even if we were inclined to do so, now is a particularly inappropriate time to take that action, for reasons to be explained in addressing Griffin's final argument.

Griffin finally advances two policy-based arguments. First, she correctly points out that part of the due process test involves a balancing of the various interests involved. Griffin highlights, and we do not discount in the slightest, the weighty interest that she has in the foreclosure process, namely, "the important and irreversible prospect ... [of] the loss of a house." [17] *Jones*, 547 U.S. at 230, 126 S.Ct. at 1716. Second, Griffin contends that the current Maryland foreclosure system is not sound public policy. Both arguments fail, largely because they are pressed in the wrong forum at this point in time.

The escalating number of mortgage foreclosures being endured nationally and in Maryland present a serious challenge to policymakers. Perhaps some changes in the foreclosure process would be beneficial to the citizens of the State of Maryland. It is, however, not the role of this Court to ensure that the Legislature maintains a more perfect balance of all interests involved. Our duty is not to substitute our own judgment of what the law ought to be for what the Legislature declares it should be. *Borchardt v. State*, 367 Md. 91, 129, 786 A.2d 631, 653 (2001). We properly evaluate the notice system, as it is, to determine if it suffers from a constitutional defect. We cannot say that the Maryland notice system fails to balance the competing interests within the constitutionally allowable spectrum and, thus, the facts of this case, where that system was followed, did not result in an unconstitutional application or result as to Griffin. The "function of the courts is ... to ascertain whether [a legislative scheme] exceeds constitutional limits These limits are not exceeded under the due process clauses of the Maryland and Federal Constitutions unless the party challenging the ordinance can show that it is arbitrary, oppressive, or unreasonable." *A. & H. Transp., Inc. v. Mayor & City Council of Balt.*, 249 Md. 518, 529, 240 A.2d 601, 606 (1968).

---

17. The damage to the property interest at stake under Maryland foreclosure law is particularly irreversible because Maryland law does not provide a statutory right of redemption.

The Maryland foreclosure scheme requires that the Trustees send notice by both certified and first-class mail, two "efficient and inexpensive means of communication" that we conclude are calculated reasonably to inform interested parties of the pending foreclosure action. *Mullane*, 339 U.S. at 319, 70 S.Ct. at 660. "In balancing the interests of the parties, the General Assembly has looked to economy, efficiency, and minimal involvement of the judiciary."[18] *Golden Sands*, 313 Md. at 495, 545 A.2d at 1338 (1988). We cannot say that that judgment was unreasonable. As was noted by the Supreme Court in *Nelson v. City of New York:*

> It is contended that this is a harsh statute. The New York Court of Appeals took cognizance of this claim and spoke of the 'extreme hardships' resulting from the application of the statute in this case. But it held, as we must, that relief from the hardship imposed by a state statute is the responsibility of the state legislature and not of the courts, unless some constitutional guarantee is infringed.

*Nelson v. City of New York*, 352 U.S. at 110–11, 77 S.Ct. at 199. Judicial restraint is necessary, even in the face of what may seem at a particular cycle in time to be the harsh application of a rule of law.

---

**18.** This efficiency has the potential to benefit all parties in a foreclosure. Any additional costs in administering foreclosures would likely be borne eventually by the defaulting mortgagor. *See Udall v. T.D. Escrow Services, Inc.*, 159 Wash.2d 903, 154 P.3d 882, 890 (2007) (noting the valid legislative "goals of promoting efficient, inexpensive, and procedurally sound foreclosures").

The amici suggest that we attempt to offset the cost of requiring personal service in foreclosure actions by reducing the number of times notice is required to be published in a newspaper. Brief of Public Justice Center et al. as Amici Curiae For Appellant at 26 n. 86. This is precisely the type of policy tradeoff considerations that are ill-suited for the judiciary to determine in a single case. The amici, ironically, rely on the Maryland Homeownership Preservation Task Force Final Report for support for the assertion that the current number of times notice must be published could be reduced safely. That document, however, was drafted to assist the Legislative and Executive branches in evaluating the mortgage foreclosure problem and balancing the various policy considerations during especially the 2008 legislative session.

It has been called to our attention that a hardship will result from an application of the rules and principles herein affirmed. While such a result is always to be regretted, it is not the province of the court to make the law so as to prevent an apparent hardship in any given case, but to expound the law and apply it, as found, to the facts shown to exist in each case. It requires no citation of authority to demonstrate that this must be the rule applied; otherwise, there would be no stability in the law, and no uniform application of it, but each case would ultimately be resolved according to the views, caprice, or even the prejudice of the judges who are to make the decision in the particular case.

*Farmers' & Merchs.' Nat. Bank of Cambridge v. Harper,* 151 Md. 358, 363, 137 A. 702, 709–10 (1926).

██ Our exercise of deference at this particular point in time is supported by the fact that the Executive and Legislative branches of our State government, being particularly suited to policy balancing, appear poised to consider the problem at a policy level.[19] "Courts are under a special duty to respect the legislative judgment where the legislature is attempting to solve a serious problem in a manner which has not had an opportunity to prove its worth." *Bowie Inn, Inc. v. City of Bowie,* 274 Md. 230, 237, 335 A.2d 679, 684 (1975).

---

**19.** Our deference to the Legislative and Executive branches is even more critical at this juncture because the scope of the mortgage foreclosure problem most likely requires a comprehensive solution, one outside of this Court's authority or institutional competence to craft in a single case. The amici and the Homeownership Preservation Task Force Final Report note the various factors that contributed to the rise in mortgage foreclosures: reckless or even predatory lending, fluctuating interest rates, falling home prices, ill-timed rate resets in adjustable rate mortgages, and lacking oversight and regulation of loan origination practices. Brief of Public Justice Center et al. as Amici Curiae For Appellant at 1–12; MD. HOMEOWNERSHIP PRESERVATION TASK FORCE, FINAL REPORT 7–12, *available at* http://www.dllr.state.md.us/whatsnews/task forcereport.pdf (last visited 1 February 2008). We are not capable of fixing a problem with so many causes outside the Court's limited judicial realm in the present case. Although policy adjustments may be needed, they are best created as part of a comprehensive solution so that the various components of such a solution may work in concert.

In the early going of the 2008 session of the General Assembly, several bills have been introduced to modify the current foreclosure system. House Bill 67—Homeowners in Foreclosure Protection Act; House Bill 58—Homeowner's Right to Rescind Sales Contract; House Bill 59—Value of Residence in Foreclosure; Senate Bill 17—Foreclosures—Notices to Record Owners; Senate Bill 535 Foreclosure—Subprime Mortgages—Moratorium. The Executive Branch appears to be analyzing the problem as well. On 13 June 2007, Governor O'Malley established the Homeownership Preservation Task Force to study the problems associated with the rising numbers of foreclosures. The Task Force's Final Report, issued on 29 November 2007, recommends several changes to the Maryland foreclosure process and contains a discussion of personal service of process. MD. HOMEOWNERSHIP PRESERVATION TASK FORCE, FINAL REPORT 37, *available at* http://www.dllr.state.md.us/whatnews/taskforcereport.pdf (last visited 1 February 2008). On 14 January 2007, the Governor proposed a number of reforms of the foreclosure notice system, including requiring two good faith attempts at personal service of process in foreclosure actions, followed by service by posting. Press Release, Office of Governor Martin O'Malley, Preserving Homeownership Proposed Legislative and Regulatory Reform (14 January 2008), *available at* http://www.governor.maryland.gov/pressreleases/080114proposals.pdf (last visited 1 February 2008). The Governor's proposals are now before the General Assembly for its consideration. House Bill 365—Real Property—Recordation of Instruments Securing Mortgage Loans and Foreclosure of Mortgages and Deeds of Trust on Residential Property; Senate Bill 216—Real Property—Recordation of Instruments Securing Mortgage Loans and Foreclosure of Mortgages and Deeds of Trust on Residential Property. The bills have already received a hearing in front of the Senate Judicial Proceedings Committee. Philip Rucker, *Annapolis Digest—A Call for Action on Foreclosure Relief,* WASH. POST, 6 Feb. 2008, at B6. We do not opine on of any of these bills or recommendations.[20] Instead, we only note that

---

20. We, however, will offer an editing note to the Task Force Final Report so that it may be more helpful to policymakers. Footnote 33

the policy urgings of Ms. Griffin and amici are being discussed now in the appropriate forum. Thus, deference to the potential for executive and legislative action is warranted at this time.

## JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.

states, as a citation, *"Jones v. Flowers,* 547 U.S. 220, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006), a case holding that notice of an impending tax sale sent via 1st class mail and certified mail to the homeowner which was returned 'unclaimed' to the sender was unconstitutional under the 14th Amendment for failing to satisfy basic due process." The more accurate citation for *Jones v. Flowers* is 547 U.S. 220, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006). Furthermore, the facts of the case indicate that only certified mail was sent to Jones's address. No first-class mail was sent.